# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TIMOTHY M. REED,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 10-1160 (ESH)** |
| ) | |
| **DEPARTMENT OF THE NAVY,** ) | |
| ) | |
| **Defendant.** ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Timothy Reed has sued the Department of the Navy under the Privacy Act of
1974 ("Privacy Act"), 5 U.S.C. § 552a *et seq*. He alleges that defendant improperly disclosed
confidential records pertaining to him, which resulted in his constructive discharge by his
civilian employer, the Charleston Police Department ("CPD"). At trial, defendant presented a
variety of defenses in the alternative: that the disclosures were not covered by the Privacy Act;
that the disclosures were justified by certain exceptions to the Act's general prohibition; that any
prohibited disclosures were not willful or intentional; that plaintiff was not constructively
discharged; and/or that his discharge was not caused by the Navy's disclosures.

The case was tried before this Court on November 5-7, 2012. The Court heard live
testimony from six witnesses, including five Navy officers and plaintiff. In addition, the parties
entered into evidence by stipulation the deposition testimony of six employees of the CPD. The
parties also introduced exhibits, including the set of documents that the parties stipulated were
released by the Navy to the CPD in April 2009. Based on the evidence at trial, the applicable

Case 1:12-cv-00576-ESH   Document 17   Filed 12/18/12   Page 2 of 24

case law, and the entire record, the Court makes the following Findings of Fact and Conclusions of Law.

<h1 align="center">FINDINGS OF FACT</h1>

**A.     Reed's Background**

1.   Plaintiff Timothy Reed was enlisted in the United States Navy from November 1990 through January 1998, when he was honorably discharged.  From March 1998 through May 18, 2009, he served in the Navy Reserve.  His service included deployments to Guantánamo Bay, Cuba, Crete, Kuwait, and Iraq.  Plaintiff was simultaneously employed as a police officer by the CPD from the spring of 2000 through May 2009.  (Trial Transcript from November 6, 2012 ("11/6/12 Tr.") at 42-47.)

**B.     January/February 2009**

2.   On December 31, 2008, plaintiff was mobilized to the Expeditionary Combat Readiness Center ("ECRC") in anticipation of being deployed to Iraq as part of a detainee guard unit.  (Def. Ex. 4 at Bates Number ("BN") 100; 11/5/12 Tr. at 64-65; 11/6/12 Tr. at 52, 122-123.) While in specialized training at Ft. Lewis, Washington, plaintiff allegedly engaged in various acts of misconduct in the period January 5 through January 19, 2009.  (Pl. Ex. 4 at BN 402090-91; Def. Ex. 3 at BN 002-005.)  Specifically, plaintiff was alleged to have pointed an M16 rifle at two other trainees while ordering them to the ground; pointed a knife at another trainee and threatened to cut him; disobeyed an order to wear Navy-issued boots; made a derogatory statement about a female officer; and made inappropriate comments about using force against Iraqis.  (Pl. Ex. 4 at BN 402090-91; Def. Ex. 3 at BN 002-005.)

2

3.   On January 23, 2009, Senior Chief Prezant, a Navy Liaison Officer at Ft. Lewis, informed ECRC about the allegations.  (Def. Ex. 3 at BN 032.)  On January 26, 2009, plaintiff was given an "emergency command directed evaluation" or mental health exam.  (*Id*. at BN 043-044.)  On January 27, 2009, a preliminary inquiry was completed at Ft. Lewis.  (*Id*. at BN 039-042.)  On the same date, Navy Lieutenant Commander ("LCDR") Aimee Cooper, a Staff Judge Advocate ("JAG") assigned to the ECRC Command, wrote a memo recommending that plaintiff be placed in pretrial confinement because he was accused of offenses triable by court-martial and because it was reasonable to believe that he might continue his alleged pattern of criminal misconduct if left at liberty.  (*Id*. at BN 032-036.)

4.   Plaintiff left several phone messages for Lieutenant Kevin Boyd, his team commander at the CPD, in January 2009.  When they spoke, plaintiff told Boyd that he had "some training issues" without providing specific details.  (Testimony of Lieutenant Kevin Boyd ("Boyd Test."), Joint Ex. 1, at BN 004-006.)  Boyd believed, based on his experience, that "if [an officer] is away from the Department and they're calling you, it's probably not a good thing." (*Id*. at BN 042.)  Boyd notified Captain Tillman, his supervisor, about the call.  No action was taken by the CPD at that time.  (*Id*. at BN 006.)  This was the first time that anyone at the CPD learned of any issues arising during Reed's deployment.

5.   On January 27, 2009, plaintiff was transported back to ECRC in Norfolk, Virginia. (11/6/12 Tr. at 124-125.)  On January 30, 2009, the Navy conducted a Disciplinary Review Board ("DRB") hearing, presided over by Command Master Chief David Carter.  (11/5/12 Tr. at 21-22.)  As the senior enlisted advisor to Captain Jeffrey McKenzie, the Commanding Officer of

the ECRC, Carter was responsible for all aspects of the disciplinary proceeding, including the investigation.  (*Id*. at 52-53.)

6.   During the DRB hearing, plaintiff indicated that he was a police officer with the CPD. (*Id*. at 23.)  Because the DRB members were skeptical of plaintiff's claim, Carter contacted the CPD after the hearing in order to confirm plaintiff's civilian employment.  (11/5/12 Tr. at 59-60.) Carter's initial call was picked up by CPD Sergeant Robert F. Gamard.  (Testimony of Sgt. Robert F. Gamard ("Gamard Test."), Joint Ex. 2, at BN 009-012.)  Carter asked Gamard if plaintiff worked for the CPD.  (*Id*. at BN 010.)  Gamard explained to Carter how to verify plaintiff's employment officially, but also informed him that plaintiff worked on CPD Team 1 as a police officer.  (*Id*.)  Carter then told Gamard that plaintiff had been involved in a "training incident" that involved pointing a firearm at other trainees, and that there were allegations that he had made ethnic and racial slurs as well.  (*Id*.)  According to Gamard, Carter asked him if he was aware of plaintiff being involved in any similar incidents at the CPD.  (*Id*. at BN 011.)  Gamard responded that plaintiff "didn't work directly for [him], and it was not something that [he] would have known" but he "directed him in the direction that he would need to go to find that information out."  (*Id*.)  Carter could not recall this conversation.  (11/5/12 Tr. at 27-28, 93.)  The Court therefore credits Gamard's recollection.

7.   Gamard gave Boyd the message to return Carter's call.  (Gamard Test. at BN 012.) When Boyd called, Carter asked if plaintiff worked for the CPD as a police officer, which Boyd confirmed.  (Boyd Test. at BN 006-007.)  Carter then said that plaintiff was involved in "some training issues" or "a situation."  (*Id*. at BN 007.)  Boyd cut Carter off and suggested a conference call with his supervisor, Captain Gary Tillman, to discuss the matter in full.  (*Id*.)

4

8.   A conference call took place between Boyd and Tillman from the CPD (with Gamard listening in briefly), and CMC Carter and LCDR Cooper from the Navy.  (Boyd Test. at BN 008-012; Gamard Test. at BN 014-015.)  Carter had received Privacy Act training (11/5/12 Tr. at 48-49), and Cooper, an attorney, was the FOIA and Privacy Act coordinator for ECRC at the time.  (*Id*. at 122-23.)  Carter asked Cooper to participate in the call so that "if there's anything that needs to be addressed legally, she, being the expert, would be able to address it."  (*Id*. at 94.)  The conference call lasted about 5 minutes.  (Boyd Test. at BN 011.)  Carter again repeated what he told Gamard, *i.e.*, that the plaintiff was involved in a training scenario that involved pointing a weapon and making derogatory statements or slurs.  (*Id*. at BN 012.)

9.   After the conference call, Tillman and Boyd informed CPD Attorney Mark Bourdon and CPD Chief Gregory Mullen about the allegations against plaintiff.  (Testimony of Mark Bourdon ("Bourdon Test."), Joint Ex. 4, at BN 010-011.)  Chief Mullen indicated that he wanted to wait until the Navy concluded its investigation before taking any action.  (*Id*. at BN 010.)

10.  Plaintiff called Gamard about a week after Carter had initially called.  (Gamard Test. at BN 012-013.)  Plaintiff asked questions about what Carter had said to Gamard.  (*Id*. at BN 013.)  In addition, plaintiff asked Gamard if he would write a character reference, which Gamard did not feel comfortable doing.  (*Id*.)  Plaintiff also called Boyd after the conference call and asked him for a character reference.  (Boyd Test. at BN 044.)

11.  On February 2, 2009, plaintiff called Mark Bourdon, who, in addition to being an attorney for the CPD, was a JAG Officer with the Marine Corps Reserve.  (Bourdon Test. at BN 007,012-013.)  Plaintiff told Bourdon that "all he [was] accused of doing was violat[ing] [operational security]" and that "the allegations against him would not hold water."  (*Id*. at BN

013-014.)  Bourdon was already aware that there were alleged weapons violations, and so he did

not question plaintiff.  (*Id*. at BN 014.)

**C.     March 2009**

12. On March 12, 2009, plaintiff was found guilty at a "Captain's Mast" proceeding of

having violated three provisions of the Uniform Code of Military Justice: disobeying a lawful

order (UCMJ Art. 92), provoking speeches or gestures (UCMJ Art. 117), and assault (UCMJ Art.

128).  He was found not guilty of making false official statements (UCMJ Art. 107).  (Def. Ex. 3

at BN 125-131.)  Captain McKenzie imposed non-judicial punishment ("NJP") on plaintiff,

reducing his rank from First Class Petty Officer (E6) to Second Class Petty Officer (E5).  (Def.

Ex. 3 at BN 126; Def. Ex. 4 at BN 101; 11/6/12 Tr. at 9, 62, 237.)  McKenzie read the charges

aloud to plaintiff at the beginning of the proceeding and had plaintiff sign the charge sheet.

(11/6/12 Tr. at 229.)  At the conclusion of the Mast, according to McKenzie, he read aloud each

charge and whether plaintiff had been found guilty.  (*Id*.)  Although plaintiff disputes this, the

Court does not credit his testimony given McKenzie's contrary testimony and the

contemporaneous documentation that was sent to the CPD in April, which had McKenzie's

handwritten notes indicating guilty verdicts on three counts and a not guilty verdict on the charge

of making false official statements.  (Ex. 3 to Bourdon Test. at BN 140-141.)

**D.     April 2009**

13. On April 13, 2009, plaintiff was demobilized from ECRC.  (Def. Ex. 4 at BN 100;

11/6/12 Tr. at 49-50, 161.)

14. On the same date, plaintiff indicated to the CPD that he intended to return to work as

a police officer.  (11/6/12 Tr. at 54, 164.)  Also on that date, Mark Bourdon contacted LCDR

Cooper to obtain information about the circumstances of Reed's separation from the Navy. (Bourdon Test. at BN 021.)  Cooper informed Bourdon about the details of the allegations against plaintiff, the fact that he had undergone a mental health exam, and the disciplinary actions that the Navy had taken against him.  (*Id*. at BN 022-026.)  Bourdon took detailed notes of the conversation.  (Pl. Ex. 3 at BN 407008-407022.)  Given the fact that these notes were taken contemporaneously by Bourdon and that Cooper's recollection of this conversation was limited (*see* 11/5/12 Tr. at 128-130), the Court concludes that the notes accurately reflect the substance of Cooper's disclosures.

15. On April 14, 2009, plaintiff was verbally notified by Captain Gregory Whitaker that he was being placed on administrative leave without pay.  (11/6/12 Tr. at 70-71.)  Plaintiff contacted the Department of Labor ("DOL") to report that the CPD was violating the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 *et seq*. (*Id*. at 72-7, 199.)  A DOL representative was sent to mediate.  (*Id*. at 199.)

16. On April 15, 2009, Bourdon asked Cooper to treat his email as a Freedom of Information Act ("FOIA") request.  (Pl. Ex. 2 at BN 008.)  On April 17, 2009, Cooper sent by email to Bourdon records of the Navy's investigation and the results of plaintiff's NJP.  (*Id*. at BN 002; Bourdon Test. at BN 039.)  Among the documents released by Cooper were several documents summarizing the allegations, documents reflecting the disposition of the charges, and sworn statements by nine witnesses to the alleged incidents at Ft. Lewis.  (Ex. 3 to Bourdon Test. at BN 135-172 (all of the documents that Cooper released to Bourdon).)  Cooper did not release numerous other documents contained in the Navy's case file, including, most notably, the January 26, 2009 mental health exam report and several documents that mentioned

plaintiff's "mental status" and the mental health exam.  (Def. Ex. 3 at BN 001-162 (entire NJP

case file).)  Cooper also did not release Reed's statements to the Navy, various letters of support

on his behalf, a record of counseling, and other administrative documents that pertained to the

case. (*Id*.)

      17. After making verbal disclosures to Bourdon, but prior to releasing the documents,

Cooper conducted research into FOIA and the Privacy Act, concluding that she could legally

release documents to the CPD under the Navy SORN N01070-3 and the Department of Defense

routine use law enforcement exception to the Privacy Act.  Cooper also relied upon

SECNAVINST 5211.5E, which provides guidance regarding the Navy's Privacy Program.

(11/5/12 Tr. at 137-38; Def. Ex. 2 at BN 001-063.)  In the process of conducting her research,

Cooper consulted with LCDR Kelly Armstrong; Lieutenant Jamrozy, an attorney formerly with

ECRC who Cooper knew to have experience in this area of law; and a Privacy Act and FOIA

Instructor (probably Lieutenant Elizabeth Rosso) from the Naval Justice School in Newport,

Rhode Island.  (11/5/12 Tr. at 144-148, 160.)  The record of Cooper's research was lost or

destroyed at some point between 2009 and the commencement of this litigation (*id*. at 142-143),

but her testimony was confirmed by Armstrong (*id*. at 179-182), by the email exchange between

Cooper and Bourdon (Pl. Ex. 2), and by some notations made by Cooper at the time.  (Def. Ex. 3

at BN 0140.)

      18. On April 17, 2009, Cooper stated in an email to Bourdon that she believed what she

had released "should be [okay]," while conceding that her Immediate Superior-in-Command

("ISIC"), Armstrong, did "not think so."  (Pl. Ex. 2 at BN 002.)  However, Armstrong only had a

preliminary opinion about whether the documents could be released based on incomplete

information and never instructed Cooper not to release the information.  (11/5/12 Tr. at 180.)

Since Cooper had FOIA release authority for ECRC, she did not need the approval of her

superiors to release documents, only to withhold documents.  (*Id*. at 149, 179-182.)

19. On April 23, 2009, plaintiff was reinstated to his former position and rank at the CPD.

(Pl. Ex. 9.)  On April 24, 2009, plaintiff was given written notification that he was being placed

on administrative leave with pay.  (Pl. Ex. 8.)  While on leave, plaintiff was prohibited from

"[o]perating a city of Charleston vehicle," "[c]onducting any law enforcement activities,"

"[e]xecuting any police powers," or "[w]orking any off-duty assignments related to law

enforcement."  (*Id*.; Pl. Ex. 11; *see also* 11/6/12 Tr. at 73.)

20. On April 23, 2009, CPD Lieutenant Anita Craven began an internal affairs

investigation into plaintiff's alleged misconduct at the Navy, which CPD considered relevant to

plaintiff's "fitness for duty."   (Testimony of Lt. Anita Craven ("Craven Test."), Joint Ex. 6, at

BN 014-015; Ex. 4 to *id*. at 402003-402004.)  Craven interviewed plaintiff on April 24, 2009 and

May 1, 2009.  (Ex. 2 to Craven Test.; Ex. 3 to Craven Test.)  Plaintiff told Craven that the assault

charges had been dropped.  (Ex. 2 to Craven Test. at BN 043-044.)  Upon Craven's request,

plaintiff provided documents reflecting the NJP punishment and his demotion in rank.  (11/6/12

Tr. at 131-133; Craven Test. at BN 040-041.)  He did not provide documentation regarding the

proceedings and findings of guilt.  (Craven Test. at BN 043.)  Plaintiff refused to sign a waiver to

allow Craven to obtain the NJP records directly from the Navy.  (11/6/12 Tr. at 68, 178; Craven

Test. at BN 039-040.)  At trial, plaintiff offered no explanation for his refusal.

21. After Craven first interviewed plaintiff on April 24, plaintiff contacted Cooper by

phone.  (11/6/12 Tr. at 208.)  With respect to this conversation, plaintiff testified: "I explained to

Commander Cooper that I had an evaluation that had two charges on there.  That was the only charges I had been found guilty of.  I said, 'However, the Charleston Police Department is saying there's this charge of assault.  I don't have nothing to prove this . . . . There's no record of it in my service record.'"  (11/6/12 Tr. at 145.)  Plaintiff testified, "Commander Cooper's response to me was, 'It was my mistake. The paperwork was not put into your service record.' And she said, 'In fact, you were found guilty of the assault charge.'"  (*Id*. at 145-146.)

22. When Craven interviewed plaintiff for a second time on May 1,  plaintiff not only failed to convey this information to her, he continued to adamantly deny that he had been convicted of the assault charge, even when Craven informed him that she had his NJP paperwork and it reflected that he was found guilty of assault.  (Def. Ex. 4 at BN 084-85.)  Plaintiff continued to insist that the only paperwork he received at the Mast proceeding reflected convictions on two charges and he continued to insist that McKenzie had dismissed the assault charge at the Mast.  (*Id*.)

23. At trial, plaintiff explained that he continued to deny to Craven that he had an assault conviction because he believed that Cooper was wrong.  (11/6/12 Tr. at 147-148.)  He testified, "I had paperwork contradicting what Commander Cooper had said . . . . I didn't believe her . . . . [b]ased upon the fact that I had documentation in my hand that said I had been found guilty of two charges.  It was an evaluation signed by Captain McKenzie.  I was there when he signed the evaluation.  There was two charges on there."  (*Id*.)  Plaintiff maintained that he was informed of some, but not all, of the offenses he was convicted of at the Mast, and that he did not receive a complete copy of the Mast paperwork until July or August of 2009.  (I*d*. at 142.)  As previously noted, the Court finds this testimony to be not credible in view of McKenzie's testimony.  (*See*

Finding of Fact ¶ 12.)  In addition, the Court notes that plaintiff contradicted himself on this point during his cross-examination when he explained that he did not tell Craven what he learned because "I had already felt that my credibility would be at stake . . . going through an internal affairs investigation.  Based upon information that the Navy had possibly already released to CPD, my concern was if I go back in there and tell Craven, 'Hey I stand corrected.  Commander Cooper told me I been found guilty of assault.'  Then they would have to retract what I've said from the first interview, and at that point they could still hold me liable for untruthfulness." (11/6/12 Tr. at 208.)

**E.    May 2009**

24. On May 4, 2009, plaintiff was put on administrative leave without pay.  (11/6/12 Tr. at 74; Pl. Ex. 11.)  On May 5, 2009, Lt. Craven concluded her investigation and issued a report, which noted the discrepancies between plaintiff's representations and the paperwork documenting the Navy's findings against him, which Craven had obtained from Bourdon.  (Pl. Ex. 13; Craven Test. at BN 029, 033-034.)

25. On May 8, 2009, plaintiff submitted a letter of resignation to Lt. Boyd, which was accepted by Chief Mullen on May 11, 2009.  (Testimony of Chief Gregory G. Mullen ("Mullen Test."), Joint Ex. 3, at BN 141; Boyd Test. at BN 034-035.)  Plaintiff has given varying explanations of why he submitted the letter of resignation.  When he was deposed, he stated "When I received my second letter or third letter of being placed on administrative leave without pay from the Charleston Police Department, in the nine years that I have been at CPD nobody goes on administrative leave without pay or more or less administrative leave with pay and is going to stay there."  (11/6/12 Tr. at 196.)  At trial, plaintiff stated "I resigned for fear of being

terminated from my job" (*id.*), and "I feared for my employment back in January when I received

phone calls from members of the Charleston Police Department after the Navy supposedly

released information." (*Id*. at 198.)

26. On May 21, 2009, the CPD completed its investigation with a finding that plaintiff

had been untruthful during the course of the investigation and had acted to hinder the

investigation. (Ex. 1 to Mullen Test. at BN 129.) No action was taken against plaintiff since he

had already resigned. (*Id*.)

27. On August 17, 2009, plaintiff began working at the Naval Weapons Station in

Charleston, SC, which is now a joint base operating under the Air Force. (11/5/12 Tr. at 75-77.)

Aside from two weeks of accumulated annual leave that plaintiff was allowed to take, he

remained unemployed from May 11, 2009, the date his resignation took effect, until August 17,

2009. (*Id*. at 77.) Prior to his resignation, plaintiff earned an annual salary of $42,000 as a CPD

officer. (*Id*. at 78.) When he began working at the Weapons Station, he earned $29,000, and he

currently earns $38,000. (*Id*. at 77-78.)

## CONCLUSIONS OF LAW

**A.     The Privacy Act**

1. The Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896, provides

agencies with "detailed instructions for managing their records and provides for various sorts of

civil relief to individuals aggrieved by failures on the Government's part to comply with the

requirements." *Doe v. Chao*, 540 U.S. 614, 618 (2004). Section 552a (g)(1)(D) of the Act

creates a cause of action for any "adverse effect" from a "failure [by the agency] to hew to the

terms of the Act." *Doe v. Chao*, 540 U.S. at 619 (citing 5 U.S.C. § 552a(g)(1)(D)). In actions

brought under (g)(1)(D), the government will only be liable for "actual damages sustained by the individual as a result of the refusal or failure." 5 U.S.C. § 552a(g)(4). Privacy Act claims for monetary damages based on improper disclosure, which arise under § 552a(g)(1)(D), have four elements: "1) the disclosed information is a 'record' contained within a 'system of records'; 2) the agency improperly disclosed the information; 3) the disclosure was willful or intentional; and 4) the disclosure adversely affected the plaintiff." *Logan v. Dep't of Veterans Affairs*, 357 F. Supp. 2d 149, 154 (D.D.C. 2004). "The burden of proof lies with the plaintiff." *Cacho v. Chertoff*, 2006 WL 3422548, at *4 (D.D.C. 2006) (citing *Reuber v. United States*, 829 F.2d 133, 141 (D.C. Cir. 1987)).

**B.      Disclosed Information Is a "Record"**

2.   Under the statute, a "system of records" is "a group of any records under the control of any agency from which information *is retrieved by* the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5) (emphasis added). Courts have derived from this definition the so-called "retrieval rule," which holds that "the Privacy Act only covers disclosures of information which was either directly or indirectly retrieved from a system of records." *Cloonan v. Holder*, 768 F. Supp. 2d 154, 164 (D.D.C. 2011) (quoting *Doe v. Dep't of Treasury*, 706 F. Supp. 2d 1, 6 (D.D.C. 2009)).

3.   Defendant argued that Carter's disclosures were based on his personal knowledge, and therefore, the Privacy Act's "retrieval rule" was not satisfied. That argument is belied by the evidence. Carter disclosed to the CPD information about incidents that allegedly occurred at Ft. Lewis in Washington State, while Carter was stationed in Virginia. Carter did not personally witness any of the alleged incidents, nor did he disclose information gleaned from the "rumor mill," which courts have held is not protected information under the Privacy Act. *See Cloonan*,

13

768 F. Supp. 2d at 164.  Carter first learned about the allegations of misconduct from a verbal

report with "general," "non-specific information."  (11/5/12 Tr. at 19.)  He subsequently received

a written report from Ft. Lewis – the preliminary inquiry report dated January 27, 2009 – which

detailed the allegations against plaintiff.  (Def. Ex. 3 at BN 039-042.)  Carter's disclosures to the

CPD were based on that report and other written documents that became part of the investigative

case file, such as first-person sworn statements repeating and substantiating the same factual

allegations. (*See* Def. Ex. 3 at BN 001-0162 (entire NJP case file).)  Thus, Carter's disclosures

were clearly derived from "records" within the meaning of the Privacy Act.

4.   Defendant argued further that, to the extent that Carter's disclosures were based on

information in the preliminary investigative file, they were not derived from a record that existed

within a "system of records."  Defendant contended that the preliminary investigative file was

developed during the course of the investigation and did not "result[] in a system of records"

until the Captain's Mast proceeding was completed.  (11/6/12 Tr. at 17.)  This argument elevates

form over substance, and it conflicts with the purposes of the Privacy Act.  Defendant's position

would lead to the absurd result that any sort of personal information could be disclosed up until

the moment when the governmental entity completes its internal recordkeeping procedures, at

which point it suddenly becomes protected.  The Court declines to adopt this interpretation of the

Privacy Act, for which defendant has presented no legal support, and instead, it concludes that

the information that Carter disclosed was derived from a "record" within a "system of records"

under the Privacy Act.

**C.**     **Carter's Disclosures Did Not Violate Privacy Act**

5.   "[T]he Privacy Act generally prohibits government agencies from disclosing

personnel files" without the consent of the individual.  *Bigelow v. Dep't of Defense*, 217 F.3d

875, 876 (D.C. Cir. 2000).  However, an agency may properly disclose a protected record if one

of a number of exemptions applies.  5 U.S.C. § 552a(b) (listing twelve exemptions).  If plaintiff

cannot establish that disclosure was improper, he cannot, as a matter of law, succeed under the

Privacy Act.  The Privacy Act allows disclosure of records "for a routine use as defined in

subsection (a)(7) . . . and described under subsection (e)(4)(D) . . . ."  5 U.S.C. § 552a(b)(3).

Section 552a(a)(7) defines a "routine use" as use "for a purpose which is compatible with the

purpose for which [the record] was collected."

      6.   Defendant has argued that Carter's disclosures were authorized by the DoD's

"requesting information" blanket routine use exception to the Privacy Act's prohibitions on

disclosure, as well as Navy System of Records Notice ("SORN") N01070-3.  The "requesting

information" exception provides that a record may be "disclosed as a routine use to a federal,

state, or local agency maintaining civil, criminal, or other relevant enforcement information . . .

if necessary to obtain information relevant to a Component decision concerning the hiring or

retention of an employee[.]"  52 Fed. Reg. 11051-01, 11067 (April 7, 1987) (routine use

exceptions incorporated by reference at 32 C.F.R. § 701.112).  SORN N01070-3 authorizes

disclosures to "law enforcement" agencies "in connection with litigation, law enforcement, or

other matters under the jurisdiction of such agencies."  75 Fed. Reg. 19627, 19629 (April 15,

2010).

      7.   Plaintiff argued at trial that the disclosures made by CMC Carter were the "but for"

cause of his constructive discharge from the CPD.  (11/7/12 Tr. at 28-31.)  In fact, in closing,

plaintiff's counsel suggested that plaintiff was constructively discharged as of the date of

Carter's first call because he "was in fear [of being fired] at that time."  (*Id*. at 33.)  Plaintiff

nonetheless conceded that Carter was justified in calling the CPD to verify plaintiff's

employment, and even conceded that if Carter had been looking for information about plaintiff's
disciplinary record at the CPD, then "arguably [his disclosures] fall[] within the blanket use."
(*Id*. at 17.)  However, plaintiff contested this version of events.  He suggested that Carter's only
motivation for calling the CPD was to verify plaintiff's employment, and, therefore, he disclosed
more than was necessary to obtain the information he sought in violation of the Privacy Act.
(*Id*.)  Plaintiff argued further that defendant engaged in post hoc rationalization when it
suggested that Carter called the CPD to obtain information about plaintiff's CPD disciplinary
history and to aid in the Navy's decision about placing plaintiff while the disciplinary matter was
pending.  (*Id*. at 6-7.)  As an alternative argument, plaintiff maintained that even if Carter did ask
and was justified in asking about plaintiff's disciplinary history with the CPD, he was not
justified in disclosing the Navy's allegations against plaintiff.  (*Id*. at 60-61.)

8.   Plaintiff takes an overly narrow view of the investigation.  At the time that Carter
called the CPD, he was in the process of investigating the allegations against plaintiff.  The DRB
suspected that plaintiff was not being truthful when he stated that he was a police officer, so
Carter called the CPD believing that he would catch him in a lie.  (11/5/12 Tr. at 59-60.)  But the
investigation was not limited to the verification of a single fact, or to the assessment of plaintiff's
credibility on a single issue.  Rather, the Navy was investigating multiple allegations of military
code violations and possible criminal acts.  As in any investigation of this nature, the Navy had
reason to assess plaintiff's credibility, but also his mental stability; whether he had a propensity
for violence or for the use of abusive language; and whether he had a history of disobeying
orders.  Furthermore, the Navy had multiple decisions to make, based on the results of the
investigation: whether plaintiff should be assigned to a detainee guard unit in Iraq as planned or
given a less sensitive assignment; whether he should be demobilized; whether he should be

discharged from the Navy Reserve and if so, under what conditions.  (11/5/12 Tr. at 52-54.)

Whether Carter articulated these additional considerations as initial motivations for his call is not

dispositive, since the Court has found that Carter did make inquiry of the CPD about Reed's

performance as a police officer, thereby supporting the inference that Carter was in fact

investigating both the existence of Reed's prior employment and whether he had had similar

problems while there.

9.  An investigation is naturally a fluid process.  How one question is answered can lead

down different paths of subsequent questioning.  If Gamard had informed Carter that plaintiff

was not in fact a police officer with the CPD, which was the answer that Carter expected, then

that would have been the end of Carter's questions.  Instead, Gamard confirmed that plaintiff

was an officer at the CPD.  Carter then posed a natural follow-up question to Gamard: whether

plaintiff had a disciplinary history at the CPD.   Insofar as Carter was seeking information

relevant to the Navy's investigation, his limited disclosure of two of the Ft. Lewis allegations

against plaintiff as a means of indicating the kinds of past behavior that he was interested in

knowing about did not violate the Act.

10. If Gamard had indicated to Carter that the plaintiff had a history of disciplinary

problems at the CPD, that information could well have been relevant to the Navy's decisions

regarding plaintiff's future.  Instead, Gamard answered that he was not in a position to know

about any disciplinary history.  (Gamard Test. at BN 011.)  Plaintiff emphasized that there was

no evidence that Carter asked about plaintiff's disciplinary history in his second and third calls

with the CPD, suggesting that even if the initial disclosures to Gamard were covered by the

"requesting information" exception, the subsequent disclosures were not.  (11/7/12 Tr. at 25-26.)

However, Boyd cut Carter off during the second phone call, so Carter did not have the chance to

ask any questions about plaintiff's disciplinary history.  (Boyd Test. at BN 007.)  Meanwhile,

Carter testified that he learned about plaintiff's assignment to a homeless shelter during the

conference call, which indicates that the call included some discussion of plaintiff's role and

performance at the CPD.  (11/5/12 Tr. at 79.)  Thus, even if Carter did not make specific inquiry

about plaintiff's prior disciplinary record after the initial call with Gamard, it is clear that Reed's

performance as a police officer was of interest and that Carter was circumspect in disclosing no

more about plaintiff's problems while at Ft. Lewis than he reasonably believed was necessary to

elicit the information he sought.

    11. Furthermore, since plaintiff relies on the premise that the first call was the "but for"

cause of his discharge, it is irrelevant whether the information disclosed during the second and

third calls – which was essentially the same information disclosed during the first call – precisely

mimicked the request for information or not.

    12. The Court therefore finds that Carter's modest disclosures were justified by the

"requesting information" routine use exception.  However, even if the disclosures extended

beyond what was strictly necessary in order to obtain the information he sought, plaintiff has

failed to meet his burden of demonstrating that the violations were willful or intentional.

"[P]roof of intent or willfulness is a necessary element of [plaintiff's] claims, and failure to

provide supporting evidence would lead to summary judgment in favor of the [government]."

*Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007).  In this Circuit,

intentional or willful means "so 'patently egregious and unlawful' that anyone undertaking the

conduct should have known it 'unlawful.'"  *Laningham v. United States Navy*, 813 F.2d 1236,

1242 (D.C. Cir. 1987) (quoting *Wisdom v. Dep't of Hous. & Urban Dev.*, 713 F.2d 422, 425 (8th

Cir. 1983)); *see also Tijerina v. Walters*, 821 F.2d 789, 799 (D.C. Cir. 1987) ("intentional or

18

willful" conduct is "somewhat greater than gross negligence," demonstrating a "flagrant disregard" for rights the Act protects) (internal quotation omitted).  Plaintiff has alleged that "what Command Master Chief Carter was trying to do was to get Petty Officer Reed fired and that's why he made the phone call" (11/7/12 Tr. at 22-23), but the record is devoid of evidence that Carter harbored an animus toward plaintiff or a desire to get him fired.  On the contrary, there is no question that Carter was seeking information as part of a legitimate investigation, and if he made any disclosures that crossed the line, the evidence does not support a conclusion that he acted with "flagrant disregard" for the Act.[1]

**D.      Cooper's Disclosures Did Not Violate Privacy Act**

13. During closing argument, plaintiff effectively conceded the legitimacy of Cooper's disclosures (*id*. at 4), and the Court agrees, for her disclosures were proper under the "law enforcement" routine use exception and SORN N01070-3.  The "law enforcement" exception states that where a record 'indicates a violation or potential violation of law, whether civil, criminal, or regulatory in nature … the relevant records in the system of records may be referred, as a routine use, to the agency concerned, whether federal, state, local, or foreign, charged with the responsibility of investigating or prosecuting such [a] violation.'"  52 Fed. Reg. 11051-01, 11067.  As stated above, SORN N01070-3 authorizes disclosures to "law enforcement" agencies "in connection with litigation, law enforcement, or other matters under the jurisdiction of such agencies."  75 Fed. Reg. 19627, 19629.

---

[1] It is also noteworthy in this regard that Carter was trained in the Privacy Act, was well aware of his duties under the Act, and asked Cooper to be present during the conference call with the CPD to be sure that he did not inadvertently violate the Privacy Act.  (*See* Findings of Fact ¶ 8.)

14. While it is debatable whether the DOD's "law enforcement" routine use exception applies in this instance, as the CPD would not be "charged with the responsibility of investigating or prosecuting" plaintiff's military code violations or criminal acts committed in Washington State, the Court need not resolve this issue since the language of the SORN N01070-3 is sufficiently broad to encompass Cooper's disclosures.  The CPD is without a doubt a law enforcement agency.  The disclosures were made "in connection with" the CPD's investigation into the allegations against plaintiff and his truthfulness about those allegations.  The purpose of that investigation was to assess plaintiff's fitness for duty as a police officer, which easily qualifies as a "matter[] under the jurisdiction of [the] agenc[y]."

15. In addition, any alleged violation of the Privacy Act with respect to these written disclosures was not willful or intentional.  It is evident that Cooper did her due diligence before releasing the documents to Bourdon.  She believed, based on her legal research and consultation with colleagues experienced in the field of FOIA and Privacy Act issues, that the disclosures were justified, as is evidenced in her email correspondence with Bourdon.  (Pl. Ex. 2.)  Furthermore, an examination of the documents that were released and those that were withheld reveals that she acted judiciously in deciding what to release.  Most notably, Cooper decided not to release any records regarding the mental health exam that plaintiff underwent or any discussion of his mental health status.

16. Cooper's verbal disclosures were also justified under the SORN, for the same reason: the disclosures were made in connection with the CPD's investigation into plaintiff's fitness for duty.  Although Cooper acted somewhat less judiciously by verbally communicating to Bourdon that plaintiff had undergone a mental health exam, this information was relevant to the CPD's assessment of plaintiff's fitness for duty, and was thus justified under the SORN.  Even if

Cooper's verbal disclosures were not justified, they cannot be considered flagrant violations of the Act, as it was reasonable to believe that the SORN justified the disclosures.

**E.      Disclosures Did Not Cause Plaintiff To Be "Constructively Discharged"**

17. Plaintiff has also failed to meet his burden of demonstrating that any of the disclosures caused him to be constructively discharged.  Plaintiff is entitled to civil remedies under § 552a(b) only if the violation had an "adverse effect" on him.  5 U.S.C. § 552a(g)(1)(D). The plaintiff must allege "actual damages" connected to the adverse effect to "qualify" under the Act.  *Doe v. Chao*, 540 U.S. at 620-27; *Mandel v. U.S. Office of Pers. Mgmt.*, 244 F. Supp. 2d 146, 153 (E.D.N.Y. 2003) (holding that plaintiff must establish a "causal connection" between agency violation and adverse effect).  Thus, plaintiff "must establish not only that he was 'adversely affected' by the improper disclosure, *but also* that he suffered 'some harm for which damages can reasonably be assessed.'"  *Mulhern v. Gates*, 525 F. Supp. 2d 174, 181-82 (D.D.C. 2007) (quoting *Doe v. Chao*, 540 U.S. at 621).

18. First, the causal link between the disclosures and plaintiff's separation from the CPD is broken by intervening events.  Carter's initial call – identified by plaintiff as the "but for" cause of his discharge – was predated by plaintiff's own call to Boyd, during which he referred in somewhat vague terms to the allegations.  Plaintiff suggested that this call would not have raised any flags because of the vagueness of his statements, but the Court cannot agree, since it raised more questions than it answered.  As Boyd testified: "if [an officer] is away from the Department and they're calling you, it's probably not a good thing."  (Boyd Test. at BN 042.) That is especially true when considered with the fact that plaintiff returned from what was expected to be a nine-month deployment after only four months.  (Ex. 4 to Craven Test. at BN 402007.)  While plaintiff argues that reservists return early from deployments for all sorts of

21

reasons (11/7/12 Tr. at 28), Bourdon testified: "Mr. Reed apparently had notified the department

that he was coming back to work and at that point knowing that he had been mobilized, I

assumed that . . . there must have been some reason to send him back and to terminate his orders

early[.]"  (Bourdon Test. at BN 021-022.)  It is therefore reasonable to infer that the combination

of plaintiff's calls to Boyd and Gamard, as well as plaintiff's early return from deployment,

would have caused the CPD leadership to look into what transpired, even in the absence of

Carter's calls.

19. Second, the Court finds that plaintiff was not constructively discharged because he

voluntarily resigned.  Although this Circuit has not opined on this issue, numerous other circuits

have made clear that facing the possibility of termination for cause does not render a resignation

involuntary.

> [R]esignations can be voluntary even where the only alternative to
> resignation is facing possible termination for cause or criminal
> charges. Resignations obtained in cases where an employee is
> faced with such unpleasant alternatives are nevertheless voluntary
> because 'the fact remains that plaintiff had a choice. [Plaintiff]
> could stand pat and fight.'  The one exception to this rule is where
> the employer actually lacked good cause to believe that grounds
> for the termination and the criminal charges existed.

*Hargray v. City of Hallandale,* 57 F.3d 1560, 1568 (11th Cir. 1995) (quoting *Christie v. United*

*States*, 518 F.2d 584, 587 (Ct. Cl. 1975), and citing *Pitt v. United States*, 420 F.2d 1028 (Ct. Cl.

1970); *Stone v. University of Maryland Med. Sys. Corp.,* 855 F.2d 167, 174 (4th Cir. 1988); and

*Schultz v. United States Navy*, 810 F.2d 1133, 1136-37 (Fed. Cir. 1987)).  *See also Parker v.*

*Board of Regents of Tulsa Jr. Coll.*, 981 F.2d 1159, 1162 (10th Cir. 1992).

20. Plaintiff testified at trial that he resigned because "I feared that I was already going to

be terminated based upon the actions of the agency.  They had already taken my credential card,

they had already taken my badge.  I was never reissued my gun upon my return to CPD."
(11/6/12 Tr. at 198.)  But the "actions of the agency" that plaintiff refers to are privileges of his
position that were suspended pending the CPD's investigation.  Those actions were taken as
precautions by the CPD while investigating serious allegations; they were not taken in order to
push plaintiff out of the job.  In short, this is not a situation in which "the employer deliberately
made working conditions intolerable and drove the employee out."  *Mungin v. Katten Muchin &
Zavis*, 116 F.3d 1549, 1558 (D.C. Cir. 1997) (internal quotation and citation omitted).

21. Plaintiff testified that he also believed he was going to be fired based on Craven
commenting off-the-record: "It doesn't look good for you, Timmy."  (11/6/12 Tr. at 75.)  Craven
denied that she made such a statement, however, explaining that "after the second interview on
May 1 . . . after the recorder was off, he asked me, 'what's going to happen?'  And my response
to him was, 'I don't know what's going to happen, because I don't know what's going to happen.
That has nothing to do with my office.'"  (Craven Test. at BN 019-020.)  The Court credits
Craven's testimony and notes additionally that even if Craven did make such a comment, it falls
far short of proof that the CPD "deliberately made [plaintiff's] working conditions intolerable."

22. Furthermore, to the extent that plaintiff's termination was inevitable, that was because
the CPD had good cause to terminate him – for untruthfulness and acting to hinder the
investigation – as he conceded through counsel during closing argument.  (11/7/12 Tr. at 34.  *See
also* Bourdon Test. at BN 087-088 (testifying that plaintiff could have been terminated based
solely on his "refus[al] to provide information requested during the investigation."))  Plaintiff
knew that he was likely to be terminated for cause, and opted to resign rather than fight to save

his job.  Given this evidence, the Court concludes that his resignation was voluntary.  *See Aliotta*

*v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010). [2]

## CONCLUSION

For the reasons set forth above, the Court concludes that there is insufficient evidence to

conclude that defendant violated the Privacy Act, or that plaintiff was constructively discharged

as a result of any Privacy Act violations.  Accordingly, judgment is entered for defendant and the

complaint is dismissed with prejudice.

_____/s/_____<br>
ELLEN SEGAL HUVELLE<br>
United States District Judge

Date: December 18, 2012

---

[2] Finally, even if one were to find liability, plaintiff failed to meet his burden of proving damages.  For the first time, plaintiff at trial came up with a damages figure of $137,000 without any explanation of the underlying facts and figures.  (11/6/12 Tr. at 79.)  While he claims a $4,000 differential between his prior $42,000 salary as a CDP officer and his current salary of $38,000 at the Naval Weapons Station in Charleston, and he claims that he would have worked another 18 or 19 years at the CPD, that still does not explain how he arrived at a figure of $137,000.  Furthermore, despite his reference to multiplying by 4%, plaintiff failed to explain why he chose 4% and what figure he was multiplying by 4%.  He also made no attempt to reduce his claim of future loss earnings to present value.  Finally, in violation of his disclosure obligations, plaintiff failed to provide defendant with any information about his damages claim.  Therefore, for all of these reasons, the plaintiff would not have been entitled to an award of future damages.